UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| CHEVRON U.S.A., INC., § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL NO. M-06-307 |
| § | |
| ARTURO E. GUERRA, JR., *et al*, § | |
| § | |
| Defendant. § | |

### ORDER GRANTING SHARE 1 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING SHARE 2 GUERRA, TIJERINA AND VARIOUS DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Pending before the Court for consideration are several Motions for Summary Judgment: Defendants Arturo Guerra, Jr., individually and as trustee for the Gloriana Guerra Trust; Sherry Ware Brown; Jeanette Markel; Fred E. Seal; Larry Eliot Seal, individually and as trustee of the David N. Seal Irrevocable Trust; and John Russell Ware's ("Share 1 Defendants") Motion for Summary Judgment (Doc. 112), Defendants Hortensia Tijerina and Gregory M. Powers as Administrator of the Estate of Raul Tijerina, Jr.'s ("Share 2 Tijerina Defendants") Motion for Summary Judgment (Doc. 134), Defendants Sara Saldana, Gloria Moore, Josefa Castellano, Jesus Castellano, Josefa Capadona, Maria Lucila Castellano, Herlinda Lozano, Raul Lozano, Carlos Lozano and David Sanchez as representatives of the estate of Maria Alicia Sanchez, Jose Miguel Castellano and Anna Maria Lozano's ("Share 2 Various Defendants") Motion for Summary Judgment (Doc. 141) and Defendants Raul J. Guerra, Jr., Jose E. Guerra, Robert L. Guerra, Sylvia Guerra Meckel, and Bianca Guerra formerly known as Bea Ann Guerra's ("Share 2 Guerra Defendants") Motion for Summary Judgment (Doc. 146). The Court held oral argument on these motions on February 21, 2007. Having considered the motions, responses, replies, arguments of counsel, the relevant law and the record, the Court **GRANTS** Share 1

Defendants' Motion for Summary Judgment (Doc. 112) and **DENIES** Share 2 Defendants' Motions for Summary Judgment. (Docs. 134, 141 and 146).

## I. Background

This action, filed as an interpleader action by Plaintiff Chevron U.S.A., Inc. ("Chevron"), arises out of a dispute over royalties on an Oil and Gas Mineral Lease covering property in Hidalgo County, Texas. The lease at issue (the "Guerra Lease") was entered into between A.E. Guerra, Cecilia Izaguirre de Guerra, Raul J. Guerra, Beatrice Champion de Guerra, and Mrs. E.E. Guerra, as lessors, and The Texas Company, as lessee, in 1943. Chevron is the successor in interest to the original lessee. The Defendants are the heirs and assigns of the original lessors. Presently, the lease comprises two separate but adjoining tracts of land, Share 1 and Share 2, each covering 2,611.32 acres.

Relevant to this matter, the Guerra Lease contains a clause governing the apportionment of royalties. It provides, in relevant part:

> [R]oyalties due and payable hereunder up to the sum of fifty cents per acre per year for the lands covered by this lease . . . shall be payable . . . in the proportion of fifty cents per acre per year for each royalty acre then owned by [the lessors] or their assigns under the terms of this lease and that any royalties due and payable hereunder annually in excess of fifty cents per acre for the acreage then covered hereby shall be due and payable to and be the sole property of the owners of the royalty under the specific acreage upon which production is then being obtained.

(Guerra Lease at ¶14, Doc. 1 attach. A).

The dispute here concerns a Chevron well ("Well #103") whose surface location is on Share 2 but whose bottom location is on Share 1. Additionally, in order to increase production from Well #103, Chevron utilized a procedure known as "hydraulic fracturing,"[1] and the

---

[1] Such fracturing is:
> a secondary recovery method used to increase production from oil and gas wells. During a 'frac job,' a thick liquid is pumped into the well under great pressure to fracture or break up rock formations that trap oil or gas. A mixture, often composed of sand, is then pumped into the

subsurface fractures created by this procedure allegedly extend into Share 2.

Because Chevron was unable to determine which lessor should be paid the royalties (in excess of the fifty cents per acre) for Well #103, it filed this interpleader action seeking a judicial determination as to whom the royalties should be paid.  For their part, both Share 1 and Share 2 Defendants claim ownership of the royalties and have asserted claims against each other and Chevron seeking recovery of same.

This matter was filed originally in the U.S. District Court for the Western District of Texas.  On October 3, 2006, the Honorable Sam Sparks issued an order that, among other things, granted motions to transfer venue filed by several defendants; the matter was then transferred to this Court. (Doc. 86 at 11).  In that same order, Judge Sparks found that Guerra Lease was a community lease.  *Id.* at 8.  The Court held further that this entitled Chevron to place its wells anywhere on either Share 1 or Share 2 and, as a result, Chevron "has no liability arising from its placement of Well #103 and therefore stands as a disinterested stakeholder in this dispute."  *Id.*  Additionally, the Court dismissed the Share 2 Defendants' counterclaim against Chevron for failure to state a claim upon which relief can be granted and denied Chevron's motion to enjoin the parallel state court proceeding. *Id.* at 9.

**A.     Share 1 Defendants' Motion for Summary Judgment (Doc. 112).**

The current royalty owners for Share 1 are: Arturo Guerra, Jr., individually and as trustee for the Gloriana Guerra Trust; Sherry Ware Brown; Jeanette Markel; Fred E. Seal; Larry Eliot Seal, individually and as trustee of the David N. Seal Irrevocable Trust; and John Russell Ware. The Share 1 Defendants argue that ownership of minerals in Texas is governed by the "rule of capture" and that, pursuant to this doctrine, the holder of a mineral estate owns all of the oil and

---

fracture to prop the fracture open. The oil and gas drain through the fractures out of the reservoir to the wellbore, allowing for the capture of reserves that would otherwise not be produced.
*Mission Res., Inc. v. Garza Energy Trust*, 166 S.W.3d 301, 309 (Tex. App.—Corpus Christi 2005, pet. granted).

gas produced by a well that is "bottomed" there, regardless of where the well is located. (Doc. 112).[2] Therefore, they argue they are entitled to the royalty because Well #103 is bottomed under Share 1.

In response, Share 2 Tijerina Defendants argue (1) even if the rule of capture applies, it does not compel the result that the Share 1 owners claim when, as in this case, "a well's completion has been 'extended' through artificially created conduits developed through fracturing treatment" and (2) due to the fracturing treatment, the well is partially bottomed under Share 2; therefore, Share 2 is owed royalties and Share 1 Defendants are not entitled to summary judgment. (Doc. 140 at 5-8). The Share 2 Guerra Defendants make the same argument, but also submit evidence alleging that 39% of production from Well #103 is attributable to Share 2; therefore, Share 2 Defendants are owed 39% of royalties and Share 1 Defendants are not entitled to summary judgment. (Doc. 148 attach. 2 at 3).[3]

### B.   Share 2 Tijerina Defendants' Motion for Summary Judgment (Doc. 134).

The Tijerina Defendants assert: (1) the Share 2 defendants should receive all or a portion of the royalties due because Chevron's artificial fracturing of the geological strata has caused the migration of hydrocarbons from Share 2 to the location in Share 1 where the well is "bottomed" and, therefore, the well should be considered at least partially "bottomed" under Share 2; and (2) the lease should be interpreted to give meaning to the parties' intention that the owners of the property upon which the well surface is located receives the royalties. (Doc. 134). In response,

---

[2] The Share 1 Defendants make note in their Motion for Summary Judgment in this Court that they were awarded partial summary judgment against Chevron as to the issue of royalty ownership in a state court action, styled *Arturo E. Guerra Jr, et. al. v. Chevron U.S.A., Inc.*, Cause No. C-1477-06-A, which remains pending in the 92nd District Court of Hidalgo County. (Doc. 112, Attach. 2). An order awarding partial summary judgment is not final and appealable. Texas courts do not give such orders *res judicata* effect and, therefore, this Court is not bound by it.
[3] Chevron responds similarly to all Defendants' motions. Specifically, Chevron asserts that this is an appropriate interpleader action and, accordingly, it is a disinterested stakeholder and has no position as to who is entitled to royalties from Well #103. (Docs. 139 and 154). Additionally, in its response to the Share 2 Guerra Defendants' motion for summary judgment, Chevron asserts because of its position as a disinterested stakeholder in this dispute, it necessarily has no liability to any party, including the Share 2 Guerra Defendants. (Doc. 154).

the Share 1 Defendants argue that the surface location of the well does not control payment of royalties, because in Texas the rule of capture is keyed to where a well is bottomed and that Chevron's fracturing operation does not result in any liability to the Share 2 Defendants. (Doc. 150). In reply, Share 2 Tijerina Defendants' argue that the rule of capture does not apply to community or pooled leases. (Doc. 163).

**C.     Share 2 Guerra Defendants' Motion for Summary Judgment (Doc. 146).**

Defendants Raul J. Guerra, Jr.; Jose E. Guerra; Robert L. Guerra; Sylvia Guerra Meckel; and Bianca Guerra, formerly known as Bea Ann Guerra, also have an interest in the royalty under Share 2. The Share 2 Guerra Defendants argue that production is being obtained at least in part from Share 2, because the well is partially completed under Share 2. (Doc. 146 at 6). Specifically, they argue that the well's completion has been "extended" into Share 2 by the use of artificially created fracture channels, which allow hydrocarbons to be taken from Share 2 by the well bottomed on Share 1. (Doc. 146 at 6-7). In support of this contention, the Guerra Defendants submitted the affidavit of Harry L. Max, a petroleum geologist, in which Mr. Max attests that hydrocarbons flowing through fractures in Share 2 contribute to 39% of Well #103's production.[4]

**D.     Share 2 Various Defendants' Motion for Summary Judgment (Doc. 141).**

Defendants Sara Saldana, Gloria Moore, Josefa Castellano, Jesus Castellano, Josefa Capadona, Maria Lucila Castellano, Herlinda Lozano, Raul Lozano, Carlos Lozano and David Sanchez as representatives of the estate of Maria Alicia Sanchez, Jose Miguel Castellano and Anna Maria Lozano are also part owners of the Share 2 royalty. These Defendants argue that,

---

[4] Share 1 Defendants' response to the Guerra Defendants raises the same arguments as its response to the Tijerina Defendants' motion. In addition to these arguments, Share 1 Defendants argue the affidavit submitted by Share 2 Guerra Defendants' expert does not satisfy the requisite *Daubert* standard for admission. (Doc. 160 at 2). Share 2 Guerra defendants reply by asserting their expert's methodology and reasoning is scientifically valid. (Doc. 162 at 1-2).

given the technology that existed at the time the lease at issue was signed, the parties must have intended for the location of the wellhead to control the payment of royalties. (Doc. 141 at 3). In the alternative, these Defendants argue that each share should receive a full royalty payment if Chevron cannot establish affirmatively the proportion of production coming from each share. (Doc. 141 at 4).[5]

## II.     Summary Judgment Standard of Review

A district court will grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to summary judgment as a matter of law. FED. R. CIV. P. 56(c). Facts are material if they might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party moving for summary judgment has "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant may meet this initial burden by submitting evidence that negates the existence of an element of the non-movant's claim or by showing that there is no evidence to support the plaintiff's claim. *Id.* at 323-25.

---

[5] Chevron's response raises the same arguments as in its response to the other Defendants and also asserts that Chevron owes only a single royalty under the community lease. (Doc. 167). Share 1 raises the same arguments as in its response to Share 2 Tijerina defendants' motion for summary judgment, but also asserts an affidavit submitted in regards to the interpretation of the lease is conclusory. (Docs. 141 attach. 1 at 1-2 and 159).

The burden then shifts to the non-movant to "produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Frank v. Xerox Corp.*, 347 F.3d 130, 135 (5th Cir. 2003) (internal citations omitted). Such evidence must establish the existence of a genuine issue and be sufficient to prevent a directed verdict against the non-movant at trial. *Celotex Corp.*, 477 U.S. at 321. While doubts and reasonable inferences regarding the facts are resolved in favor of the non-moving party, the party's conclusory allegations, which are not supported by concrete and specific facts, will not defeat summary judgment. *Anderson*, 477 U.S. at 247. Moreover, the evidence is construed in favor of the non-moving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir.1999).

### III.   Analysis

It is a rule of law in Texas that:

> [W]here several owners of adjoining tracts of land unite in a single lease to a third party for development of oil or gas as a single tract, and provision is made for delivery of the royalty to the lessors, **in the absence of an agreement to the contrary**, the royalties must be divided among the lessors in the proportion that the area of the tract owned by each bears to the total area covered by the lease, and the ownership of the tract upon which a well may be drilled and from which oil may be produced is a matter of no consequence.

*French v. George*, 159 S.W.2d 566, 569 (Tex. App.—Amarillo 1942, writ ref'd) (emphasis added). The Guerra Lease is one in which owners of adjoining tracts joined to lease the right to develop the entire oil and gas estate to a third party. While the default rule in such cases is that the royalty interest holders share all oil and gas royalties in proportion to the surface area owned by each, in the case at bar the various landowners included a specific clause within the lease to control the apportionment of royalties. Thus, the language in that apportionment clause controls the disposition of this matter. *See id.*

When interpreting contracts—including oil and gas leases—executed in Texas, a federal court sitting in a case founded in diversity applies Texas law. *See H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir. 1998); *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) (oil and gas lease is a contract).[6] In Texas, whether a contract is ambiguous is a question of law for the court, and the interpretation of an unambiguous contract is also a matter of law. *Steuber Co. v. Hercules, Inc.*, 646 F.2d 1093, 1098 (5th Cir. 1981); *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). A contract is unambiguous if it is susceptible to only one reasonable interpretation. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). When interpreting an unambiguous oil and gas lease, the Court must ascertain and give effect to the parties' intent as expressed within the four corners of the lease. *Luckel*, 819 S.W.2d at 461. Courts should give the language used in the lease its plain grammatical meaning, unless doing so would defeat the parties' intentions. *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966). Courts must endeavor to harmonize all parts of the lease; thus, all provisions within the lease must be considered with reference to the whole instrument. *Luckel*, 819 S.W.2d at 462.

In this matter, the apportionment of royalties between the Share 1 and Share 2 owners is controlled by paragraph 14 of the Guerra Lease. In relevant part, it reads:

> [R]oyalties due and payable hereunder up to the sum of fifty cents per acre per year for the lands covered by this lease . . . shall be payable . . . in the proportion of fifty cents per acre per year for each royalty acre then owned by [the lessors] or their assigns under the terms of this lease and that any royalties due and payable hereunder annually in excess of fifty cents per acre for the acreage then covered hereby shall be due and payable to and be the ***sole property*** of the owners of the royalty ***under the specific acreage upon which production is then being obtained***.

(Guerra Lease at ¶14, Doc. 1 attach. A) (emphasis added).

---

[6] This is so even though this matter was brought under the federal interpleader statute, 28 U.S.C. § 1335, because that statute rests on diversity jurisdiction. *See Griffin v. McCoach*, 313 U.S. 498, 503 (1941).

According to the lease's unambiguous terms, every lessor receives a pro rata share—based on the percentage of leased acreage each owns—of the first fifty cents per acre of any royalties paid annually, regardless of where the surface wells are located or where those wells are bottomed. Any royalties in excess of fifty cents per acre per year, however, are payable solely to the "owners of the royalty under the specific acreage upon which production is then being obtained." Thus, the dispute here centers on which Share should receive the excess royalties for Well #103, because both Share 1 and Share 2 Defendants assert that they are the owners—either in whole or in part—of the "acreage upon which production is then being obtained."

In order to determine if there is an ambiguity in this disputed lease language, the court must consider the contract as a whole in light of the circumstances that existed when the contract was signed; therefore, the Court will consider the doctrines, usages and customs that were in effect when the Guerra Lease was executed. Share 2 Defendants contend that the parties' intent was for surface location to control payment of excess royalties because the allocation of royalties has always been based on surface location. (Docs. 134 at 4, 141 at 3 and 146 at 5). Additionally, Share 2 Tijerina Defendants argue that because directional drilling was not contemplated by the parties when the Guerra Lease was executed, the parties' intent was for surface location to control royalty payments. (Doc. 134 at 8). It is undisputed, however, that the parties to the Guerra Lease have never before confronted the issue of allocating royalties involving a directionally drilled well, the type of well at issue here. (Doc. 150 at 4). Moreover, directional drilling was known at the time the Guerra Lease was executed; therefore, the parties should have contemplated the type of scenario at issue here when deciding how to allocate royalties. *See*, *e.g.*, *Ivey v. Phillips Petroleum Co.*, 36 F.Supp. 811, 816 (S.D. Tex. 1941).

With this in mind, our review of Texas law reveals that the disputed lease language refers

unambiguously to the location from which oil or gas is extracted—that is, the location where the well is "bottomed." Texas courts have found consistently that the term "production," as used in oil and gas leases, means the actual "physical extraction" of the mineral at issue from the soil. *See, e.g., Exxon Corp. v. Middleton*, 613 S.W.2d 240, 244 (Tex. 1981). Thus, the tract described in the Guerra Lease as the "acreage upon which production is then being obtained" is that Share that is the actual source of the produced oil or gas; the point at which the extracted oil or gas is ultimately brought to the surface (i.e., the wellhead location) does not control. *Cf. Hastings Oil Co. v. Texas Co.*, 234 S.W.2d 389, 397 (Tex. 1950) (holding that the language "*produced* from the lands [of an owner]" in a 1919 Texas statute was a reference only to extracting oil from beneath one's *own* land; it did not mean "taking oil from the land of an adjoining owner by means of a deviated well" surfaced on one's own property).

Indeed, in cases involving directional well drilling across property lines, it is typically held that a well's bottom location is the site of "production" and controls royalty payments. *See* 3-42 Eugene Kuntz, A TREATISE ON THE LAW OF OIL AND GAS § 42.7 (collecting cases and noting that a "royalty clause should apply to production realized by the lessee from any well which is bottomed under the leased premises, regardless of the situs of such well on the surface"); *see also Pauley v. Faucett*, 269 P.2d 89 (Cal. Ct. App. 1954) (instrument granting a royalty on oil and gas "within or underlying or which might be produced and saved from" a tract of land did not require payment of a royalty when the producing well was surfaced on that tract but bottomed under an adjacent property). There is no indication in the Guerra Lease that the parties intended anything other than this standard meaning of "production" to apply to the royalty apportionment provision.

Our determination that the parties meant for the excess royalty to go to the owner of the

land where the well is bottomed, and not where it is surfaced, is supported by examining other sections of the lease itself. *See Luckel*, 819 S.W.2d at 462 (court must attempt to harmonize all parts of contract). Specifically, in those instances where the parties intended for surface location to control apportionment of payments, the lease states so explicitly. For example, in paragraph seven, the lease states that delay rentals should be apportioned "according to the *surface* area of each" lessor. (Guerra Lease at ¶7). Similarly, the last sentence of paragraph 5 in the lease makes a distinction between the "production of oil and gas" and oil and gas "produced from *any well on said land*." (Guerra Lease at ¶5) (emphasis added). Thus, if the parties intended for surface location or well placement to control the apportionment of excess royalties, they could have used those express terms—indeed they did so in other parts of the lease. Accordingly, surface location of the well does not control royalty payments under paragraph 14.

Moreover, contrary to the argument of some Share 2 defendants, the Guerra Lease does not provide for apportionment of the excess royalty between the two Shares in cases where the oil or gas at issue flowed to the "producing" Share from the other Share. The lease provides specifically that any royalty in excess of fifty cents per acre per year is the "*sole* property" of the owner of the land under which production is obtained (i.e., where the well is bottomed). (Guerra Lease at ¶14, Doc. 1 attach. A) (emphasis added). This express allocation of the excess royalty is not altered in this case by Chevron's use of "fracturing" (or "fracing") to increase production at Well #103, even though this activity results allegedly in increased drainage from Share 2 into Share 1. Indeed, at the time the lease was executed in 1943, the "rule of capture"—which provides that a landowner may produce all the oil that will flow out of wells on his land, even if the oil migrates there from adjacent land—was a known concept in Texas and in the oil and gas

industry at large.[7] *See Brown v. Humble Oil & Refining Co.*, 83 S.W.2d 935, 940 (Tex. 1935); Robert E. Hardwicke, *The Rule of Capture and Its Implications as Applied to Oil and Gas*, 13 TEX. L. REV. 391, 393 (1935). Accordingly, at the time of contracting in 1943 the parties knew that, as a general rule, a producing landowner is not liable to the owner of an adjacent tract for oil that may be drained from adjoining land. *See Elliff v. Texon Drilling Co.*, 210 S.W.2d 558, 561-562 (Tex. 1948). If the parties to the Guerra Lease had wished to contract around this general principle, they could have done so. Instead, the single, determining factor in the Guerra Lease controlling the apportionment of the excess royalties is the location of *production*.

    Moreover, the parties' agreement to apportion the first fifty cents of royalties per acre per year (based on percentage of acreage owned) to all Shares indicates that the contracting parties meant to ensure that all Share owners receive at least some compensation if production occurred. It appears the parties included this "insurance" clause because they knew that: (1) basing royalty payments on "production" location alone would deprive the non-producing Share of royalties for oil or gas that may drain from its tract and (2) the non-producing Share could not drill on its Share to offset such drainage (which is the typical self-help remedy under the rule of capture) because Chevron controls where wells are located pursuant to the lease's terms. To hold now, as some Defendants ask this Court to do, that the excess royalty should be apportioned based on percentage drained from each Share would thwart the contracting parties' effort to address the drainage issue through the deliberately crafted apportionment provision in paragraph 14.

    Finally, the Court declines to apply to this matter the rule found in some Texas cases that

---

[7] The Share 2 Tijerina Defendants argue the rule of capture does not apply to community or pooled leases. (Doc. 86 at 7-8) (In an earlier order in this matter issued by the U.S. District Court for the Western District of Texas, Austin Division, the Guerra lease was held to be a community lease.) The defendants are only partially correct, however. (Doc. 163 at 4). Texas courts have held specifically that the rule of capture does not apply to pooled or unitized leases. *See Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625, 634 (Tex.App.—Austin 2000) ("[e]ffective pooling in essence abrogates the rule of capture"); *Russell v. City of Bryan*, 846 S.W.2d 389, 391 (Tex. App.—Houston [14th Dist.] 1992). The Court, however, is not aware of any Texas court holding that a community lease with non-apportionment royalty provision, such as the agreement at issue here, abrogates the rule of capture.

hydraulic fracturing that enters into an adjoining leasehold may constitute trespass and justify the imposition of damages. *See, e.g., Mission Resources, Inc., et al v. Garza Energy Trust,* 168 S.W.3d 301, 311 (Tex. App.—Corpus Christi 2005, pet. granted). The Court notes that the law in Texas on this issue remains unsettled, as *Mission Resources*—the only Texas case of which the Court is aware that holds definitively that such fracturing supports a trespass cause of action—is currently under review in the Texas Supreme Court. Even if the state's high court were to find that fractures that extend across property lines constitute subsurface trespass, such a holding would not be dispositive in this case. Indeed, this matter involves land subject to a single, community lease; it is not a dispute involving two separate leaseholds as in *Mission Resources*. *Mission Resources, Inc.,* 168 S.W.3d at 311; *see also Gregg v. Delhi-Taylor Oil Corp.*, 344 S.W.2d 411 (Tex. 1961) (similar fracturing case). Because Chevron had a right to enter and develop any and all areas of Share 1 and Share 2 under the community lease, there can be no trespass action here even if the alleged fractures did extend across the Share boundaries. Rather, the language contained within the Guerra Lease controls this matter, and it provides specifically that the excess royalty is the ***sole*** property of one group—the owners of the "production" location.

Chevron filed a directional survey with the Texas Railroad Commission which states the bottom location of Well #103 is in Share 1. The Share 2 Defendants appear to concede this. (Doc. 78 at 2). Instead, their experts' affidavits focus on the amount of fracturing that extends into Share 2 and its effect on Well #103's production. (Doc. 134 at attach. 2 at ¶ 10); (Doc 146 at attach. 2 at ¶14). As explained above, however, the amount and location of fracturing surrounding Well #103 does not control royalty payments. Because the uncontroverted evidence indicates that Well #103 is bottomed on Share 1, and because we hold that well bottom location

controls payment of excess royalties under the Guerra Lease, the royalties in dispute here should be paid to the Share 1 Defendants.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Share 1 Defendants' Motion for Summary Judgment (Doc. 112) and **DENIES** Share 2 Defendants' Motions for Summary Judgment. (Docs. 134, 141 and 146).

SO ORDERED this 13th day of September, 2007, at McAllen, Texas.

_____
Randy Crane
United States District Judge